# PICKFORD *v.* TALBOTT.

ERROR TO THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA.

No. 13.   Argued October 26, 1908.—Decided November 30, 1908.

Crime and credulity are not the same and mere neglect on the part of a prosecuting officer to investigate the character of witnesses on whose testimony an indictment is based is not tantamount to deliberate design; and in a suit for libel brought by such an officer against the owner of a journal charging him with blackmail, evidence as to whether he had made such investigation was properly excluded as irrelevant, the court not having excluded evidence as to the plaintiff's character.

In this case the court below rightly held the defendant responsible for the publication of the libel.[1]

28 App. D. C. 498, affirmed.

THE facts are stated in the opinion.

*Mr. Henry E. Davis*, with whom *Mr. Samuel Maddox* and *Mr. H. Prescott Gatley* were on the brief, for plaintiffs in error:

The cross-examination of the plaintiff was being properly conducted when interrupted by the court.

The "good faith" of the defendant in error in procuring the Rockville indictment went to the very heart of the action. If it could have been made to appear by the admissions of the witness, testifying in his own behalf, that while State's attorney he was in league with the man Hudson and the insurance companies, in a scheme which his predecessor denominated "blackmailing," the jury would have made short work of the case when they retired to consider of their verdict; and it was impossible to do this except by probing the conscience of the witness through the medium of cross-examination.

As tending to show that he was not a man of good character, evidence of particular acts of misconduct would not have been admissible except in the way attempted—by cross-examination when he tendered himself as a witness in his own behalf.

The rule is now well settled that this may be done. Wigmore on Evidence, § 981, and cases there cited; *Eames* v.

---

[1] The syllabus in the report of this case below, 28 App. D. C. 498, on the question of responsibility, is as follows:

"A charge to the jury in a libel case is correct which in effect states that one who procures the publication of a newspaper article libelous *per se*, or the circulation of copies of a newspaper containing such an article, is liable to the person defamed, no matter who wrote the article; and that a principal is responsible for a libelous newspaper article written by his agent, if the agent's general authority was such as fairly carried with it the authority to express in the principal's behalf what the article contains."

*Kaiser*, 142 U. S. 491; *Griffin* v. *Henderson*, 117 Georgia, 383; Townshend on Slander, 669, § 406; Newell on Libel and Slander, 290, § 39; *Earl of Leicester* v. *Walter*, 2 Camp. 251; *Witherbee* v. *Marsh*, 20 N. H. 563; *Wilson* v. *Noonan*, 27 Wisconsin, 598; *Conroe* v. *Conroe*, 47 Pa. St. 198; *Varnum* v. *Townsend*, 21 Florida, 447; *Treat* v. *Browning*, 4 Connecticut, 409; *Williams* v. *Miner*, 18 Connecticut, 477; Odgers on Libel and Slander, Bigelow's Notes, §§ 304, 305.

The greatest latitude is and should be allowed on cross-examination, especially of a party to the suit, for the purpose of sifting the conscience of the witness, touching his accuracy of statements, veracity, and credibility; and even specific, extraneous offenses and other matters material to the issues may be inquired into, if they have any bearing thereon. 1 Greenleaf, § 446; 3 Jones on The Law of Evidence, § 826; Taylor on Evidence (8th ed.), § 1459; *Kirschner* v. *The State*, 9 Wisconsin, 137; *Hitchcock* v. *Moore*, 70 Michigan, 112; *Hay* v. *Reid*, 85 Michigan, 296, 307; *State* v. *Merriman*, 34 S. Car. 39.

The line of examination which was interrupted by the court was entirely material. If the defendant in error, vested with the power of destroying the character of his fellow citizens, undertook so to do upon the unsupported statements of a perfect stranger, into whose character he made no inquiry before using that power against plaintiffs in error, he manifested in himself a character so far below the standard as to make the injury to him proportionately less than would be the injury to a man whose character is normal.

In many of the later cases the rule has been modified to the extent that matter tending to mitigate damages, even though, at the same time, bearing in the direction of testimony tending to prove the truth of the libel, might be admitted as mitigating damages upon both the grounds above indicated, namely, first, as derogating from the character of the plaintiff, and, second, as reducing the malice involved in publishing the libel. Had the testimony here excluded been admitted, it would have been a fair and forcible argument to

make to the jury both that the defendant in error, being a man so reckless of regard for his duty and the rights of others, had not the character entitling him to the solace for its injury, which a man of normal character might demand, and also that the plaintiffs in error, smarting under the infliction of an injury growing out of such recklessness, could not be held guilty of the extent of malice to be imputed to one without any such instigation publishing a libel against another.

The trial court in the matter of the rule that the truth cannot be given in evidence on the issue of not guilty, gave undue weight to the case of *Underwood* v. *Parkes*, 2 Strange, 1200. See *Bush* v. *Prosser*, 11 N. Y. 362; *Van Derveer* v. *Sutphin*, 5 Ohio St. 302; *Huson* v. *Dale*, 19 Michigan, 29, 30.

The result of the authorities is that while in impeaching the character of a witness the inquiry is, in general, limited to his general reputation, yet where the feature or trait of character sought to be inquired into touches, or is involved in, any issue in the case, such feature or trait may properly be gone into, especially where the witness is a party and the feature or trait in question is directly pertinent to the gravamen of the action or the peculiar ground of damage alleged.

In a case of libel involving the character of the plaintiff, any matter tending to show that his character is of a sort not susceptible to damage is clearly pertinent; and how much more pertinent is an inquiry tending to show that in respect of a particular character, as that of probity in office, the plaintiff lacks it; and that he lacks it is, as of course, better shown by proof of specific acts of dishonor, brought directly home, than by proof of the general estimation in which he may be held by those ignorant of such acts. In the case at bar the interrupted attempt was to show that the defendant in error, by reason of his conduct in the very matter in controversy, was not entitled to and did not have the peculiar character in respect of which he claimed to have been injured, namely, a character for probity in office; and the refusal to permit this matter to be gone into on cross-examination

worked injury to the plaintiffs in error so manifest as of itself to call for a reversal of the judgment.

*Mr. Andrew Lipscomb* and *Mr. John Ridout* for defendant in error:

The line of interrogation was not true cross-examination because not responsive to the direct examination.

It was obviously useless because the court cannot suppose that the defendant in error would have admitted that he had acted in bad faith in submitting the matter to the grand jury and preparing an indictment upon their presentment so that no harm to plaintiffs in error ensued although palpable injury to defendant in error did result because he was thereby precluded from giving his version of the finding of the indictment.

Upon familiar principles the court cannot deal with the supposed error because there is nothing in the record in the nature of an offer to prove any definite fact by the witness, so that the court cannot tell what the effect of the ruling was except that it can be plainly seen that it was more injurious to defendant in error than to plaintiffs in error.

This clearly appears by Mr. Lipscomb's statement in the record that he was willing the so-called cross-examination should proceed on the lines indicated.

It was a clear attempt to prove by cross-examination and in advance a part of the defendant's case in chief.

It is well settled that this cannot be done over objection, either by the court or by counsel. Jones on Evidence, §§ 820, 821, 837; *Philadelphia Ry. Co.* v. *Stimpson*, 14 Pet. 461; *Northern Pacific Ry. Co.* v. *Urlin*, 158 U. S. 271.

The "English rule" allowed practically a cross-examination of a witness on the whole case, but it is by the "American rule" equally well settled in a large majority of States and all the Federal courts that it is limited to matters brought out by the direct. *Houghton* v. *Jones*, 1 Wall. 702; *Philadelphia R. R. Co.* v. *Stimpson*, 14 Pet. 448.

It was also plainly an attempt to prove justification without pleading it, and this as the record discloses, was the controlling reason for the *sua sponte* ruling by the court.

Justification cannot be proved in this jurisdiction unless specially pleaded, and here the only plea was the general issue. The doctrine on this subject is stated by Mr. Newell in his work on Libel and Slander, §§ 68 to 76 and the notes thereto.

The doctrine briefly stated and established beyond any peradventure is that "the truth" or "justification" must be specially pleaded and with sufficient precision and particularly to enable the plaintiff to know precisely what is the charge he is to meet. *Richardson* v. *State*, 66 Maryland, 205; *Smith* v. *Tribune*, 22 Fed. Rep. 13, 118; *Woodruff* v. *Richardson*, 20 Connecticut, 238; *Knight* v. *Foster*, 39 N. H. 576; *Smith* v. *Blanchard*, 42 N. H. 137.

The scope and extent of the cross-examination like the order of proof are within the sound judicial discretion of the trial court, and such rulings will not be disturbed unless they clearly amount to an abuse of that discretion.

The bad character either generally or in the office as State's attorney of defendant in error may be shown, but such showing should be made by, and only by independent proof, as part of defendant's case. Such proof was not offered and at the argument counsel for appellants admitted that it could not be obtained. This admission sustains the contention already made that the so-called examination would have been not only useless but injurious to appellants.

MR. JUSTICE McKENNA delivered the opinion of the court.

This is an action for libel brought in the Supreme Court of the District of Columbia. The plaintiff in the action, defendant in error here, secured a verdict for $8,500, upon which judgment was entered. It was affirmed by the Court of Appeals. 28 App. D. C. 498.

The facts are set out at some length in the opinion of the Court of Appeals, and need not be repeated. It is enough to say that defendant in error Talbott was, at the time of the publication of the libel, State's attorney for the county of Montgomery, in the State of Maryland. During his incumbency of that office an indictment was found upon the testimony of one Hudson, charging plaintiffs in error with the crime of arson, for having set fire, it was charged, to a building owned by them in Montgomery county. The building was insured for $30,000, of which, after controversy, there was paid $21,000. The libelous article was published in a paper published in the city of Washington, called the Sunday Globe, and copies circulated in the county of Montgomery, Md. The article was entitled "History of a Crime in which District Attorney Talbott, of Maryland, Enacts a Leading Role." It accused Tabott of entering into a "criminal scheme" with Hudson, and a man by the name of Hopp, to blackmail Pickford and Walter, plaintiffs in error, which "culminated" in the "nefarious indictment," and, in order that the actors in it might be "unmasked," the facts were said to be stated as they were learned "after a thorough investigation." Certain facts and instances were detailed, among others the association of Hudson and Hopp, an attempt by the latter to obtain money from Pickford to stop the prosecution of the indictment, the payment of Pickford to Hopp of certain marked bills, the arrest of Hopp, the advancement of money by Talbott to Hudson, the demand of Pickford's attorney for trial of the indictment, and motions to continue the same by Talbott, and the final dismissal of the same by him when the court peremptorily ordered him to proceed. The article concluded with these words: "The district attorney [Talbott] thereupon, by leave of the court, entered a *nol. pros.* and the great conspiracy thus came to an inglorious end."

It appeared from the evidence that the predecessor in office of Talbott (Alexander Kilgour) had refused to prosecute plaintiffs in error, and to him, plaintiff in error, Pickford, in his

testimony, attributed the declaration that the "whole thing" was a "blackmailing scheme." Kilgour, in his testimony, stated that he did not recall using the word "blackmailing," but said that in all probability he had done so, and "that it was an effort on the part of the insurance companies to use his office for the purpose of collecting their money."

The declaration contained four counts, the first of which was taken from the jury. In all of them, however, Talbott alleged his incumbency of the office of State's attorney for the county of Montgomery, and that, as "such officer, he was always reputed amongst the citizens of said county" and of the United States, "and deservedly so reputed, to be upright, honest, just and faithful in the performance of the public duties imposed upon him by his oath of office and the laws of the State of Mayland." Injury to his good name and credit was alleged. The defendants pleaded the general issue.

At the trial, Talbott being on the stand, testified that he had investigated the crime for which Pickford and Walter were indicted, and that it had been brought to his attention by a man by the name of Thompson, "in a vague and indefinite letter," which was followed by another letter, in which it was stated the crime was arson. He testified that Thompson was a newspaper man, whom he had never seen before, and on whom he called in response to the second letter. He also testified that Thompson told him that Hudson would be a witness, but did not tell him who Hudson was, but that he (Hudson) was thoroughly in touch with the situation. Subsequently he went with Thompson to see Hudson, taking a stenographer with him. He further testified that he did not know whether he asked Thompson if the matter had been brought to the attention of Mr. Kilgour. And further testified that the fire occurred during Kilgour's incumbency, and that he had not inquired of Kilgour about it. He also testified that the fire occurred in September, 1897, two years and four months before he qualified. He testified further that both Thompson and Hudson were strangers to him. At this point

the court interrupted the examination, and the following
occurred:

"The COURT. On what line are you pursuing this inquiry?

"Mr. MADDOX. I am going to show, if I can, the absence of
good faith in this indictment on the part of the district at-
torney.

"Thereupon, after discussion and explanation on the part
of counsel for defendants, the following occurred:

"The COURT. I think I have heard enough to know what
your proposition is.  I cannot see but that it is an attempt
to prove the truth without pleading it.  .  .  .  You may
prove anything Pickford heard the witness say, before the
article was published.

"Mr. MADDOX. I want to prove by this witness first by his
own testimony in connection with the transaction complained
of in this article, that he is not a man of good character, which
he says he is.

"Mr. LIPSCOMB. I do not object *by our* [to your] asking him
that, Mr. Maddox.

"Secondly. I want to show that Mr. Pickford, from what
he heard the plaintiff say, had reasonable grounds to believe
that he was mixed up in some way with this conspiracy.

"The COURT. You may prove anything Pickford heard
the witness say before the article was published.

"Mr. MADDOX. I understand the court will not let me go
into the inquiry as to whether or not the plaintiff knew the
man Hudson before he made this presentment to the grand
jury and whether he investigated the character of the man.

"The COURT. Under your statement that you propose by
that line of testimony to prove that the district attorney acted
in bad faith, I will not hear it, because I do not think it is
relevant for that purpose."

This ruling is assigned as error here, as it was in the Court
of Appeals, and it is attacked on the ground that "the 'good
faith' of the defendant in error in procuring the Rockville in-
dictment went to the very heart of the action."  And counsel

supplement this by saying that "if it could have been made to appear by the admission of the witness, testifying in his own behalf, that while State's attorney he was in league with the man Hudson and the insurance companies, in a scheme which his predecessor denominated 'blackmailing,' the jury would have made short work of the case when they retired to consider their verdict; and it was impossible to do this except by probing the conscience of the witness through the medium of cross-examination." It is obvious, by "good faith," counsel mean the truth of the charge. But in the subsequent discussion they seem to make it equivalent to good character, and contend that the examination was in rebuttal of the allegation of the declaration that defendant in error "was upright, honest and just" in the performance of his official duties.

For the right to show the character of the witness counsel adduce many cases, and assert besides the freedom that may be exercised in cross-examination. But the counsel who tried the case marked a distinction between the character of the witness and his good faith, and on that distinction the court made its ruling. It will not do now to identify them and claim a right that was not denied. The attorney for defendants (plaintiffs in error) was careful to say that he made no objections to questions directed to character, and the final purpose as declared had no reference to that. But what is the testimony and what is the argument built upon it? Counsel who conducted the defense said: "I understand the court will not let me go into the inquiry as to whether or not the plaintiff knew the man Hudson before he made this presentment to the grand jury, and whether he investigated the character of the man." It is now argued that this was an inquiry of a specific fact affecting the character of Talbott, showing that he exhibited a "reckless disregard of the rights of others," and this, taken in connection with certain facts mentioned, "shows," it is said, "a readiness on the part of the defendant in error to smirch the character of plaintiffs in error amounting to recklessness, such that if the defendant in error were at

bar for his conduct in the premises would be held to show malice of the degree calling for punitive damages." And it is urged, after considerable discussion, that "the interrupted attempt was to show that the defendant in error, by reason of his conduct in the very matter in controversy, was not entitled to and did not have the peculiar character in respect to which he claimed to have been injured, namely, a character for probity in office. . . ."

We are not able to concur in the conclusion. A charge of using an office to procure an indictment as part of a conspiracy to blackmail could not be justified or in any degree excused by the facts offered to be proved. One might be a careful and zealous officer and not stop to investigate the characters of prosecuting witnesses. Besides, the charge was not of careless credence of an accusation of crime against innocent men, but of a scheme deliberately planned, through a "nefarious indictment," to use the words of the libel, to extort money from innocent men. We think, therefore, that the trial court was right in rejecting the proffered evidence as irrelevant. We could not hold otherwise, unless we should hold that crime and credulity are one and the same thing, and we repeat that the mere neglect to investigate the character of witnesses is not equivalent to such disregard of the rights of others as to be tantamount to deliberate design, certainly not a deliberate design to blackmail. We say "mere neglect," because this was all the offer amounted to. It was already in evidence for what it was worth that Hudson was a stranger to Talbott.

The second assignment of error is based upon the contention that the court erroneously instructed the jury in regard to the responsibility of the plaintiff in error for the libel.

It is not necessary to give the testimony. We will assume that it might have been contended that plaintiffs in error were not connected with either the printing or publishing of the first article or the second (there were two), or with either. The instruction asked and the instructions given by the court

are too long to be copied and difficult to summarize. They are set out in the opinion of the Court of Appeals, and it will be seen from them that those given by the court, which were not objected to, embodied all, as the Court of Appeals held, that was contained in the instruction refused, adapted to the testimony and the consideration which the jury might give to its various phases.

*Judgment affirmed.*