# TALBOTT v. PICKFORD.

---

EQUITY; INJUNCTION; EXECUTION; CONSTITUTIONAL LAW.

1. It is within the jurisdiction of a court of equity to restrain a party from availing himself of a judgment obtained at law, if it be made clearly to appear that there are facts which proved it to be against conscience, which facts the complaining party was prevented from availing himself of on the trial at law by fraud or accident, unmixed with any fault or negligence of himself, his counsel, or agents; but the party seeking such relief must show clearly that he had a good defense to the action at law, which by fraud or accident he was prevented from making, and also that there was no fraud nor negligence on his part.

2. In a suit at equity to enjoin the execution of a judgment at law obtained in an action of libel, in which action the truth of the alleged libel was not pleaded, where it is alleged in the bill that evidence of the truth of such libel was only discovered after the rendition of the judgment, the plaintiff must not only aver but prove that the failure to discover such evidence and to plead it by way of defense was not

through his fault or lack of diligence.   (Citing *Pickford* v. *Talbott,* 28 App. D. C. 498, s. c. 211 U. S. 199, 53 L. ed. 146, 29 Sup. Ct. Rep. 75.)

3. To justify a court of equity in enjoining a judgment on verdict at law on the ground of newly discovered evidence, it is not sufficient that such evidence might possibly have caused the jury to have found a different verdict, but it must appear beyond reasonable doubt that it would have done so.

4. *Quære,* whether, in view of the 7th Amendment of the Federal Constitution, providing that "no fact tried by a jury shall be otherwise examined in any court of the United States, than according to the rules of the common law," a court of equity has jurisdiction to enjoin a judgment on verdict in an action at law.

No. 2152.   Submitted October 19, 1910.   Decided February 6, 1911.

HEARING on an appeal by one of several defendants (a severance having been granted) from a decree of the Supreme Court of the District of Columbia enjoining the execution of a judgment in an action of libel.             *Reversed.*

The COURT in the opinion stated the facts as follows:

This is an appeal from a decree perpetually enjoining the execution of a judgment recovered in an action of libel in the supreme court of the District of Columbia by Henry M. Talbott against Thomas H. Pickford and John H. Walter.

The action was begun September 27, 1902, and ended in a judgment for plaintiff for $8,500, March, 1906.   That judgment was affirmed by the court of appeals December 14th, 1906, and on appeal to the Supreme Court of the United States again affirmed November 30, 1908.

The bill on which this decree was entered was filed January 8, 1909, by Pickford and Walter against Henry M. Talbott, Aulick Palmer, Thomas M. Talbott, Andrew A. Lipscomb, and Henry F. Woodard.   Palmer was sued as marshal of the district, and Thomas M. Talbott, Lipscomb, and Woodard as assignees in part of the judgment.

The bill gives a lengthy history of criminal proceedings

against plaintiffs in the circuit court of Montgomery county, Maryland, for arson, conducted by Talbott, State's attorney, the dismissal of the same, and the institution of the action at law by Talbott for damages for a libelous publication relating to Talbott's action in procuring the indictment of the plaintiffs.

The bill further alleges that the gravamen of the said action was that, in the publication complained of, Pickford and Walter had charged defendant Henry M. Talbott with an abuse of his official position, and prostitution of his said office for the purpose and in the hope, through the criminal proceedings, of obtaining from the insurance companies large sums of money, and in effect using his said office for his personal end and gain. That at the time of the filing of said declaration, the complainants believed it to be true that the defendant Talbott had in fact caused the said indictment for the purpose aforesaid, and so informed their counsel before filing pleas to said declaration, but complainants were advised by their counsel that should they attempt by their said pleas to justify the publication of the said article by pleading the truth thereof, and fail to make good such plea by evidence to the court and jury, the said attempt at justification would be held to be a repetition and republication of the said libel, and would aggravate the damages possibly to be recovered in said cause. They were also advised that if they should plead not guilty, they would in all probability be excluded from endeavoring to prove the truth of the said article; and the complainants, principally because of the secret nature of the supposed and believed conduct of the said Talbott in the premises, being unable after due diligence to submit and procure for their counsel evidence which in the opinion of the counsel might properly and safely be offered before the court on the trial of the said cause at law, in justification of the said article and libel and in proof of the truth thereof, were compelled to confine their defense in the said cause to the general issue, and were thereby deprived of the right to offer evidence tending to prove the truth aforesaid; and although their counsel did in fact offer, on the said trial,

evidence tending to impugn the good faith of said defendant in procuring the indictment aforesaid, the justice trying the said cause declared that such offer was an attempt on the part of said complainants and their counsel to prove the truth of the said article without having pleaded the same. Wherefore, the said offer of the said testimony was rejected by the court.

The complainants were permitted to introduce the same, not in justification of the said libel, or to prove the truth thereof, but to indicate the absence of malice and to mitigate the damages.

This was followed by a lengthy statement of matters offered in evidence at the trial of said action, tending to show a conspiracy between one Hopp and one Hudson, co-operated in by Talbott, to extort money from Pickford. It was then further alleged that before pleading to said declaration the plaintiffs (defendants thereto) and their counsel diligently inquired of every person believed or suspected to have any possible knowledge in the premises, with a view of obtaining evidence to support a plea of justification, and to prove the truth of the alleged libelous matters. Said inquiries were wholly in vain, until, on December 29, 1908, one of their counsel, in an accidental meeting and conversation with one of the judges of the said circuit court of Maryland, ascertained from him the following facts:

Between the finding of the indictment and the time the same was *nolle prossed*, the said judge had a conversation with Talbott, and asked him why he kept the said case open on the docket, in view of the decision of Mr. Justice Bradley, in the soundness of which opinion and decision he expressed his concurrence; whereupon the said Talbott told the judge that he was keeping the case open because he had a large fee, to wit, $11,000, involved, and which he, the said defendant, expected to get through a civil aspect of the case, in which some insurance companies were interested; and in the same conversation the defendant in effect stated, or caused the said judge to understand and believe, that the defendant was keeping the

case open in order to get out of the complainants a large sum of money, for his, Talbott's personal gain and advantage.

It was further alleged that prior to said date neither parties nor counsel had any knowledge or suspicion of said conversation, nor could they by the exercise of any diligence have learned of the same through said Talbott or the said judge; and it did not occur to them or their counsel that said Talbott could or would have made such statements to anyone. On the day the bill was filed a restraining order was served upon the defendants. Henry M. Talbott answered the bill specifically denying the allegations thereof relating to his misconduct and to his statements to Judge Henderson. He further said that, in discussiong the indictments, either he or Judge Henderson expressed the opinion that the insurance companies could recover what they had paid plaintiffs.

The answers of the other defendants are unimportant. The testimony offered by the plaintiffs took a wider range presenting matters in evidence in the trial of the action at law. This is omitted as immaterial, as also certain other evidence relating to conduct and declarations of Lipscomb, who had been of counsel of Talbott in the action at law, after the judgment had been affirmed by the Supreme Court of the United States; and who had become estranged from his former client. This is omitted as it seems wholly irrelevant, as well as otherwise inadmissible.

The material testimony in support of the bill was that of Judge Henderson, which is substantially as follows: He had known Talbott for twenty years. Talbott entered upon the duties of State's attorney in January, 1900, remaining four years. Remembered the indictment of Pickford and others, for a fire occurring in 1897. After the indictment, had a conversation with Talbott, stated as follows: After the disposition of the habeas corpus case in the District of Columbia, Talbott came to see me several times and asked me to suggest some means by which the defendants other than Pickford could be brought within the jurisdiction of the court. I told him I could make no suggestions, that the only recourse would be to

secure a requisition, and that had been tried, and the defend-
ants had been released under a habeas corpus proceeding. I
had examined somewhat the question that had been decided,
namely, the validity of the indictment, as to whether or not
it charged any offense under the law of Maryland, and reached
the same conclusion that Justice Bradley had. Mr. Talbott
dissented from this interpretation of the law, and contended
that it was sufficient to charge the offense in the words of the
indictment, and then any evidence of corrupt motive could be
adduced in support of the indictment at the trial. He stated
that he was especially interested in the conviction of these
defendants, because he believed that the insurance companies
had been defrauded; that he represented the insurance com-
panies, and that if the defendants were convicted, it was prob-
able the companies could recover the money they had paid
after the fire; that a large fee was involved in the matter. I
understood him to say that the fee would amount to about $11,-
000. He stated that he wished, at least, to retain the case on
the docket, because he had every reason to believe that if Shaw,
one of the defendants, was brought within the jurisdiction of
the court, he would confess and turn State's evidence. He
said "we" would receive a fee, but did not say who constituted
the "we." My recollection is at the November term of court,
Talbott wished to secure further time. I think the court an-
nounced that he would have to try the case or enter a *nolle*. He
then *nolled* the case as far as Pickford was concerned. The
same action was taken with reference to Walter, and has been
recently taken with reference to Bradshaw. The indictment
now stands against Shaw. I may have mentioned the matter
to one or two members of the bar, and, if I did, told them to
say nothing about it. I mentioned the matter to Mr. Henry
E. Davis, counsel for the defendant Pickford, on the evening of
Xmas Day, 1908. I had been informed that the Supreme
Court of the United States had sustained the judgment of the
court of appeals, and I supposed at that time the litigation was
at an end, or I should have never mentioned the matter to Mr.
Davis. I do not remember any consultation with Talbott with

respect to the form of the indictment before it was found. I am positive that I never stated that the indictment would be good under sec. 7, article 27, of the Code. Witness recalled that Talbott had shown him a paper purporting to be a con- fession of Hudson, but thinks it was after the indictment. After reading that paper witness did not exercise his judicial authority to prevent the proceeding under the indictment. Af- ter the indictment had been found, I had nothing to do, either with the further prosecution of it, or the requisition. I have no recollection of the members of the grand jury conferring with me about the indictment, but if my advice had been requested, I would have advised them that they could not find an indictment on the evidence of Hudson alone. Was sure that he was never consulted by Talbott as to the form of the indict- ment, or the sufficiency of the evidence before the indict- ment. No inquiry was ever made by anyone purporting to be counsel for Pickford or Walter prior to Xmas Eve, 1908, con- cerning my knowledge of the attendant circumstances on the indictment of Pickford and Walter. I was at the B. & O. R. R. station at Rockville. Had just gone out for a walk, and gotten as far as the railroad station when I met Mr. Davis. During the course of the conversation, I asked him whether the judg- ment of Talbott against Pickford had been paid. He said no; that some question had arisen about the division of the judg- ment, and it had been held up until that question could be settled. Had been impressed by the fact that Talbott had, in his suit against Pickford, recovered a sum which was sub- stantially equivalent to what his fee might have been had he recovered the claims for the insurance companies, and I thought he had been particularly fortunate, and that impression had been made on my mind when I heard the result of the case, and I suppose it continued there. I have not said that the statement conveyed any idea of impropriety to my mind. Maintained silence, but may have mentioned it to one or two members of the bar, with the injunction of secrecy. My motive was, be- cause I was judge of the court before which Mr. Talbott was a member, and was brought into frequent contact with him, and

I did not want to do anything that would incur his enmity. I did not feel that I was called upon to do it. I have a very definite recollection of the conversation with Talbott. I could not have imagined that. From the time of that conversation down to December, 1908, I have made no allusion to the conversation, with the possible exception of one or two members of the bar of Rockville; and took no action respecting the information obtained from that conversation. Pickford alone could only have been tried at the term of the court at which he appeared, because the others had not been arrested. If there is any good reason why the parties should be tried together, the practice is to wait a reasonable time to secure the arrest of the other defendants. In this case it had been made manifest that the attendance of the other defendants could not be secured, and the court was of the opinion that there was nothing in the indictment, and, therefore, it is very likely, insisted that, so far as Pickford is concerned, the case should be disposed of. Where the testimony concerning one defendant would have been identical with that concerning all, there would have been good reason for waiting a reasonable time for the arrest of the other parties, if the court had been satisfied that there was any substantial offense charged in the indictment.

On his own behalf, Henry M. Talbott testified that he had heard the testimony of Judge Henderson, and had since read the record of it. That he never made at any time or place the statements attributed to him in that testimony. He knows Andrew A. Lipscomb, but never had any arrangement or agreement with him, directly or indirectly, with respect to the collection of money for the benefit of the insurance companies, or any one of them. Never had any agreement, express or implied, with the insurance companies, or any one of them, for any fee, or for any action to be taken by me, either officially or individually, in the interest of those companies, or for any purpose whatever. Never had any arrangement before or after the indictment of Pickford, Walter, Shaw, and Bradshaw, with James Hudson, having for its object the use of the prosecution of these men in the interest of the insurance company.

Some other testimony offered by the defendants is omitted as immaterial, having apparently been offered in rebuttal of some of the evidence of plaintiffs, before referred to as irrelevant.

Henry M. Talbott, alone electing to appeal, was granted a severance from his codefendants for that purpose.

*Mr. John Ridout* for the appellant.

*Mr. Henry E. Davis, Mr. Samuel Maddox,* and *Mr. H. Prescott Gatley* for the appellees.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

Modern legislation generally authorizes the setting aside of judgments at law after term, and the granting of new trials for good cause shown in petitions therefor addressed to the court rendering the judgment complained of. These remedies, by reason of their justice and efficacy, have largely superseded the practice of resorting to equity to obtain injunctions against the executions of such judgments. Their consequences are not so serious as those resulting from perpetual injunctions against executions, which forever conclude the plaintiffs in the judgments enjoined; for the extent of the relief obtained through the statutory remedies is to reopen the case for another trial of the issues by a jury in the same court. The plaintiff in judgment is afforded a chance to try the truth and weight of the newly discovered evidence, if that be the ground of relief, or to retry the case on its merits, if, by accident or fraud, the opposing party may have been deprived of a fair trial in the first instance.

There is no statute governing the proceedings in this jurisdiction in such cases, and the equity jurisdiction remains unaffected. It is well settled that it is within that jurisdiction to restrain a party from availing himself of a judgment obtained at law, if it be made clearly to appear that there are facts which prove it to be against conscience, which facts the

complaining party was prevented from availing himself of on the trial at law by fraud or accident, unmixed with any fault or negligence of himself or his counsel or agents. *Marine Ins. Co.* v. *Hodgson,* 7 Cranch, 332–336, 3 L. ed. 362, 363; *Hendrickson* v. *Hinckley,* 17 How. 443–445, 15 L. ed. 123, 124; *Crim* v. *Handley,* 94 U. S. 652–659, 24 L. ed. 216–219; *United States* v. *Throckmorton,* 98 U. S. 61–65, 25 L. ed. 93–95.

The importance and value of the settled maxims of public policy, that there shall be an end of litigation, or that repeated litigation between the same parties in regard to the same subject of controversy shall be prevented, make it an imperative condition of such relief that the party seeking it shall make it clearly appear that he had a good defense to the action, which, by fraud or accident, he was prevented from making, and also that there was neither fault nor negligence on his part. In the language of the court of appeals of New York: "The conditions under which such claims can be supported require at least the proof of extraordinary circumstances, the absence of laches, and the establishment of a case showing no reasonable doubt as to the conclusiveness of the discovered proof, the justice of the claim, and the merits of the controversy." *New York* v. *Brady,* 115 N. Y. 599–607, 22 N. E. 237.

Assuming, for the moment, that the newly discovered evidence elicited from the witness Henderson would be sufficient ground for restraining execution of the judgment as decreed in this case, it was incumbent upon the plaintiffs to prove, as well as allege, that the failure to discover evidence of the truth of the libelous charges, and plead the same by way of defense, was not through their own fault or failure of diligence. In our opinion they have not discharged this obligation. The publication assailed the fairness and integrity of the State's attorney, accusing him of using his position for the purpose of oppression and extortion, and was grossly libelous. Plaintiffs, as defendants in that action, denied that the publication was made by them or their authority or investigation. They did not plead the truth of the charges. In the trial they attempted to show the truth of the charges on the cross-examination of the plain-

tiff in the case. The evidence was rejected, and rightly so, because there was no plea to warrant its introduction. *Pickford* v. *Talbott,* 28 App. D. C. 498–505, s. c. 211 U. S. 199–208, 53 L. ed. 146–150, 29 Sup. Ct. Rep. 75.

The bill for injunction alleges as the reason for the failure so to plead, that the parties had made diligent efforts to discover evidence to support such a defense, which proved futile, and had, in consequence, been advised by their counsel that to plead justification without some proof in support of the plea would possibly prejudice their case through a probable aggravation of the damages. This was a fact in issue, and constitutes an essential foundation for the relief sought. A careful examination of the record discloses no evidence whatever in support of the allegation. One of the plaintiffs, Walter, was not offered as a witness at all, even to contradict the evidence of the witness Hudson (one of the parties charged with the conspiracy to extort money from him and Pickford through the prosecution in Maryland), to the effect that Walter had offered him $500 for an affidavit of facts in support of the bill. Neither Pickford nor his leading counsel in the action for libel, who were witnesses, testified to a single fact tending to show that there had been any effort to discover evidence of the truth of the charges, or any advice not to plead justification because of the failure to discover evidence to support it.

This opinion might well have ended here, but the importance of the case and the questions involved warrant the discussion of other points.

Assuming, now, that the facts elicited from the lately discovered witness could not reasonably have been discovered before, that there was no lack of diligence in searching for like evidence, and that there was no fault or mistake in omitting to plead, we pass to the question: Is that evidence so certain and conclusive that it would, without reasonable doubt, have determined the action for libel in defendant's favor, could it then have been made available?

It must be borne in mind that the burden of proof of such facts would be upon the party pleading them. The witness,

Judge Henderson, testified to a conversation had with Talbott about nine years before, of which he had no memorandum to refresh his memory. The difficulty of being able to report accurately an oral statement made to one, especially after a lapse of years, is too well known to require comment. Moreover, the testimony of the witness shows that he could not be equally certain in respect of some other conversations relating to the prosecution, then depending in his court. Talbott as a witness on his own behalf expressly denied making the statements attributed to him, but testified to having discussed certain questions of law relating to the form of the indictment, and the extradition proceedings thereon. He also expressly denied any arrangement made or contemplated with anyone, by which the was or expected to receive any pecuniary benefit from the prosecution of the several indicted persons. Considering the ordinary laws that govern human conduct, it would, under ordinary conditions, seem improbable that a lawyer of any capacity, holding the important office of State's attorney, would, without apparent motive, deliberately make a statement to anyone, much less the judge of his circuit, that he was using the powers and opportunities of his office for private gain. The plaintiffs, appreciating this, allege it as one of the reasons why they made no inquiries to ascertain if such was the case. Again, the impression which the witness now has of the conversation would seem, in a measure at least, not to have been so strong at the time. It does not appear that he rebuked the attorney, or warned him that the case must be promptly tried or dismissed. No notice was given to the members of the bar that the conduct of the attorney might be investigated; the reason being that he did not care to do anything that might incur his enmity. When the indictment was called for trial, the request of postponement by Talbott was not denied, but offered to be granted upon condition that, if not ready on the postponed date, the defendants should have a verdict of not guilty. Knowing of the pending action for the libel, no information was given of this important fact, in the interest of justice.

We are not undertaking to say that the testimony is not to

be believed, but to call attention to the circumstances that a jury would have been called upon to consider, had it been submitted to them, with the burden of proof explained.

In the light of all the circumstances mentioned, we cannot concur with the learned justice below in the conviction that, had this testimony all been before the jury, a different verdict would necessarily have been the result. It might have been so; but the possibility, or probability even, that a jury might have been influenced thereto, is not sufficient to warrant a decree forever enjoining the execution of a judgment regularly obtained in a court of law. There ought to be no reasonable doubt as to the result.

We have considered this case upon the assumption of the undoubted jurisdiction of equity to restrain the enforcement of a judgment at law, but we are not unmindful of the fact that it is not a perfectly settled question that the jurisdiction is not forbidden by the 7th Amendment, which declares that "no fact tried by a jury shall be otherwise examined in any court of the United States, than according to the rules of the common law." The point was made in the Supreme Court of the United States in the case of *Fidelity Mut. L. Ins. Co.* v. *Clark,* 203 U. S. 64–73, 51 L. ed. 91–95, 27 Sup. Ct. Rep. 19, but was not found necessary to be decided; nor is it here.

For the reasons assigned, the decree will be reversed, with costs, and the cause remanded to the equity court, with direction to dismiss the bill.                    *Reversed.*

On application of the appellee, an appeal to the Supreme Court of the United States was allowed, February 8, 1911.